UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


LISA BOYER,                        )   3:14CV1557
                                   )
          Plaintiff                )
                                   )  JUDGE JAMES G. CARR
          v.                       )  (Mag. Judge Kenneth S. McHargh)
                                   )
COMMISSIONER OF SOCIAL             )
     SECURITY ADMIN.,              )
                                   )
                                   )
          Defendant                )  REPORT AND
                                   )  RECOMMENDATION


McHARGH, MAG. JUDGE

          This case is before the Magistrate Judge pursuant to Local Rule.  The issue

before the court is whether the final decision of the Commissioner of Social Security

("the Commissioner") denying Plaintiff Lisa Boyer's applications for Disability

Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and

423, and Supplemental Security Income benefits under Title XVI of the Social

Security Act, 42 U.S.C § 1381 et seq., is supported by substantial evidence and,

therefore, conclusive.


I.  PROCEDURAL HISTORY

          On February 21, 2011, Plaintiff Lisa Boyer ("Boyer") applied for Disability

Insurance benefits and Supplemental Security Income benefits.  (Doc. 10, Tr., at 19,

185, 180.)  Boyer's application was denied initially and upon reconsideration.  (Tr.,

at 19, 129, 133, 142, 160.)  On January 31, 2012, Boyer filed a written request for a hearing before an administrative law judge.  (Tr., at 148.)

An Administrative Law Judge ("the ALJ") convened a hearing on March 6, 2013, in Toledo to hear Boyer's case.  (Tr., at 19, 39-74.)  Boyer was represented by counsel at the hearing.  (Tr., at 41.)  Charles McBee ("McBee"), a vocational expert, attended the hearing and provided testimony.  (Tr., at 41, 66-73.)

On May 23, 2012, the ALJ issued her decision applying the standard five-step sequential analysis[1] to determine whether Boyer was disabled.  (Tr., at 20-21.)

---

[1] Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001).  The Sixth Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.  20 C.F.R. § 404.1520(a)(4)(i). Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.  Id. § 404.1520(a)(4)(ii).  Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled.  Id. § 404.1520(a)(4)(iii).  Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled.  Id. § 404.1520(a)(4)(iv).  Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.  Id. § 404.1520(a)(4)(v).

The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir.1997).

Based on her review, the ALJ concluded Boyer was not disabled.  (Tr., at 20, 32.)
Following the issuance of this ruling, Boyer sought review of the ALJ's decision
from the Appeals Council.  (Tr., at 14-15.)  However, the council denied Boyer's
request for review, thus rendering the ALJ's decision the final decision of the
Commissioner.  (Tr., at 1-3.)  Boyer now seeks judicial review of the Commissioner's
final decision pursuant to 42 U.S.C. § 1383(c).

Boyer briefs two issues:

1.  Whether the ALJ's assessment of Ms. Boyer's Residual Functional
Capacity ["RFC"], which excludes the full extent of plaintiff's upper
extremity limitations, is supported by substantial evidence.

2.  Whether substantial evidence proves Ms. Boyer's disability once her
upper extremity limitations are properly accounted for.

(Doc. 14, at 1.)


## II.  PERSONAL BACKGROUND INFORMATION

Boyer was born on June 26, 1970, and was 40 years old as of her alleged
disability onset date.  (Tr., at 31, 185.)  Boyer has a high school GED, and an
associate's degree is systems engineering.  (Tr., at 21, 31, 43, 63.)  She has past
relevant work as cashier, recycler, inspector of parts, machine operator, and two
motor operator.  (Tr., at 30.)

---

*Wilson  v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004).

### III.  MEDICAL EVIDENCE[2]

In her application, Boyer reported that "all of the physical or mental conditions" that limited her ability to work were rheumatoid arthritis and back injury.  (Doc. 10, tr., at 208.)  At the hearing, Boyer testified that she was diagnosed with rheumatoid arthritis in 2009.  (Tr., at 44.)  She also testified that she has depression, related to the arthritis. (Tr., at 47.)

The ALJ found that Boyer has the following severe impairments: rheumatoid arthritis ("RA"); spinal fusion in 1992 with residual pain; dysfunction of major joint (status post foot surgery); mild obesity; an affective disorder; an anxiety disorder; and, a personality disorder with a history of drug and alcohol abuse in current remission.  (Tr., at 21-22.)

Boyer contests the ALJ's RFC findings and conclusions regarding her "capacity to engage in jobs requiring fingering and handling," and the related finding that Boyer could engage in substantial gainful activity.  (Doc. 14, at 9.)  Thus, the court will limit its presentation of the medical evidence to evidence concerning that issue.  In support of her claim, Boyer discusses her interactions with two physicians.  (Doc. 14, at 9-12.)

Rheumatologist Vivian Maria P. Hobayan, M.D., begin treating Boyer on January 25, 2010.  (Tr., at 303-304.)  Dr. Hobayan noted that Boyer's symptoms of

---

[2] The following is merely a summary of the medical evidence relevant to the undersigned's decision.  It is not intended to fully reflect all of the evidence the undersigned took into consideration.  Given the contested issues in this case, the focus is on evidence concerning limitations of the arms and hands.

pain on both shoulders dated back to 1996, but no diagnosis of rheumatoid arthritis was made at that time.  Dr. Hobayan reports that Boyer was diagnosed with rheumatoid arthritis in May 2009, by a rheumatologist named Dr. Schriver.  At that time, she began medication with a combination of Methotrexate, Plaquenil, and Prednisone, which has helped.  Despite the medication therapy, however, Dr. Hobayan noted that Boyer still had occasional pain and swelling on both shoulders, as well as both hands.  It was also noted that Boyer had been battling depression because of her arthritis diagnosis.  Boyer also reported "occasional paresthesias with numbness and tingling on her hands that would come and go."  (Tr., at 303.)

Dr. Hobayan's impressions at the initial visit of January 2010 were that Boyer had "seropositive rheumatoid arthritis, still with [a] few swollen and tender joints, but for the most part, it is controlled on combination DMARD[3];" with a history of depression and chronic fatigue; paresthesias of hands and feet; and long-term current use of steroids and high-risk medications.  (Tr., at 303-304.)  Dr. Hobayan's treatment plan including adjusting her medications, X-rays of the chest, hands, and elbows, and a follow-up visit.  (Tr., at 304.)  The elbow X-rays were unremarkable, but the hand X-rays revealed joint space narrowing in several fingers on both hands.  (Tr., at 305.)

Boyer returned to Dr. Hobayan for the follow-up visit on February 24, 2010.  The doctor reported that Boyer's arthritis was "overall better since dose of

---

[3]  DMARD= Disease-Modifying Anti-Rheumatic Drugs.

Methotrexate has been increased."  Although Boyer continued to have pain and swelling in both hands, and minimally in her wrists, it was "usually better with taking her medications."  Dr. Hobayan also reported that combination therapy had been helpful.  There was intermittent paresthesias of hands and feet.  (Tr., at 301.)

At an April 22, 2010, follow-up appointment with Dr. Hobayan, the doctor reported that Boyer's RA was controlled by her medications, and she denied any major flares.  Depression and fatigue were "overall better."  Intermittent paresthesias of hands and feet for the most part was better.  Although Boyer noted occasional swelling and pain of the knuckles of her right hand, and right wrist, it was "usually better with steroids."  Boyer's medications were adjusted.  (Tr., at 299.)

Boyer returned to Dr. Hobayan for another follow-up visit on June 15, 2010.  Dr. Hobayan reported:

> Seropositive rheumatoid arthritis is overall better with Methotrexate and Plaquenil.  She is able to taper dose of Prednisone without any major flares.  Bilateral trochanteric [hip] bursitis has been symptomatic more so on the left side in the last month . . . partial relief with Prednisone.  . . . occasional pain on the elbows . . . dull localized, with stiffness, worse with lifting, no visible swelling, Mobic gives partial relief.

(Tr., at 297.)  Dr. Hobayan also noted that depression and fatigue were better, and paresthesias were stable.  Dr. Hobayan injected Depo-Medrol and lidocaine into the left trochanteric [hip] bursa.  Id.

A consultative physical exam was performed for Social Security by Oyekunle A. Oyekanmi, M.D., on July 1, 2011.  (Tr., at 317-324.)  Boyer's chief complaints as

presented to Dr. Oyekanmi were: "I have rheumatoid arthritis and back pain." (tr., at 321.) Manual muscle testing was normal for all tested areas, including shoulders, elbows, wrists, hip, knees, and feet.  Boyer's grasp, manipulation, pinch, and fine coordination was found to be normal for both hands. (Tr., at 317.)  Boyer was found to be able to pick up a coin, key, write, hold a cup, open a jar, button or unbutton, zipper, and open a door. (Tr., at 318.)  Range of motion  was found to be normal in all areas. (Tr., at 318-320, 323.)  Although Boyer reported tenderness in the right shoulder, further examination revealed normal range of motion. (Tr., at 323.)

As to Boyer's rheumatoid arthritis, Dr. Oyekanmi reported "some local findings that appeared to be consistent with the subjective complaints."  The doctor noted that Boyer's current complaints are polyarticular, and she has tenderness involving the shoulder and hip.  Dr. Oyekanmi noted that Boyer will benefit from the continued use of her medications.  Dr. Oyekanmi stated:

> Based on the overall evaluation findings coupled with the on-going symptoms, some physical activity limitations would be beneficial. Such should include being limited to light tasks, which should include no more than 10 pounds limit of lifting, pushing, pulling, and carrying. This should be occasional, which implies up to but no more than one-third of an eight period.

(Tr., at 323.)  Physical activity limitations related to her back pain were similar:  10 pounds limit for lifting, pushing and pulling; and bending, twisting and turning limited to occasional.  Id.

7

## IV.  TESTIMONY OF VOCATIONAL EXPERT

The vocational expert, Charles McBee, testified that Boyer had past relevant work as a Cashier II, a recycle laborer, an inspector of parts, a machine operator, and a tow motor operator or "two truck driver."  The ALJ stated that she would be limiting Boyer to sedentary work, and the vocational expert agreed that Boyer would not be able to perform any of her past jobs.  (Tr., at 68.)

The ALJ posed a hypothetical question concerning an individual of the same age, education and work experience, with the sedentary limits, that the individual would be limited to lifting, carrying, pushing and pulling no more than ten pounds either frequently or occasionally.  (Tr., at 68.)  The pushing and pulling would be limited as to the arms and legs to an occasional basis only.  (Tr., at 68-69.)  Standing and walking would be limited to two hours out of an eight-hour workday, with no prolonged walking greater than 15 minutes at a time.  Sitting could be six hours of eight, with "a need to stand and stretch at least one minute every hour, not to exceed ten percent of the day."  (Tr., at 69.)

Additional limitations included, no ladders, ropes, or scaffolds; no hazardous work environments, like unprotected heights, no dangerous or fast moving machinery, no driving commercial vehicles,; reaching would be limited to occasional; fingering and handling limited to frequent; and "posturals" limited to occasional.  Work would be limited to "unskilled," defined as simple repetitive tasks, with an SVP no greater than one to two, in a static work environment, nonpublic

8

jobs, with only occasional superficial contact with coworkers and supervisors.  (Tr., at 69.)

Based on the limitations of the hypothetical, the vocational expert named two jobs.  First, a call out operator, DOT 237.367-014, sedentary, SVP two.  In Ohio, there are at least 1,000 such jobs, and in the national economy at least 27,000.  (Tr., at 69.)

The VE also named a surveillance system monitor, but modified the job description as limited in the DOT.  The VE pointed out that the DOT described this monitor as someone who works in government installations or railway stations.  The VE pointed out that the essential job functions of a surveillance system monitor are more broadly employed in today's economy, and the job is performed in department stores, office buildings, and other situations where monitoring of personnel and/or property is required.  The DOT defines the job as one that is in government installations, DOT 739.687-182, sedentary, SVP 2.  In Ohio, there are at least 3,000 such jobs, and there are at least 125,000 in the national economy. (Tr., at 69-70.)

The ALJ asked if the fingering and handling was altered from frequent to occasional, what would the impact be, and the VE responded that the jobs would be eliminated, and there would be no other jobs.  (Tr., at 70.)  The ALJ also asked whether, in addition to normal breaks and lunch, the individual would be off task 20 percent or more because of pain, fatigue, and mobility limitations, the jobs would be impacted.  (Tr., at 70-71.)  The VE's response was that those jobs would be

9

eliminated, and there would be no other jobs.  (Tr., at 71.)  The same response

obtained to a query as to the impact of an individual who was absent three or more

days a month because of pain, fatigue or medical treatment.  Id.

Counsel for Boyer asked the vocational expert whether the jobs he named in

response to the original hypothetical (call out operator and surveillance monitor)

were "examples or is that the list of jobs that would fit the hypothetical?"  The VE

responded that those jobs were simply representative examples.  In response to

counsel's further question, the VE testified that he could name other jobs that

would be within the terms of the hypothetical.  (Tr., at 71.)

Counsel for Boyer then explored the surveillance monitor job with the

vocational expert.  The VE, in response to counsel, clarified his position that the

essential job functions of monitoring a screen, being able to observe individuals or

property at a monitoring station, should not be limited to the job as it's defined in

the DOT (i.e., government installations), but would also apply to someone

monitoring a department store or some other retail establishment.  The VE based

his broader definition of the job on his observation of how the jobs are performed,

and that the essential job functions exist in situations beyond the limits of the DOT

definition.  (Tr., at 71-73.)  The VE clarified that the job numbers he provided

pertained to the more limited DOT definition, not to a broader definition.  (Tr., at

73.)

## V.  ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in her

March 22, 2013, decision:

1.  The claimant meets the insured status requirements of the Social
Security Act through December 31, 2013.

2.  The claimant has not engaged in substantial gainful activity since
December 1, 2010, the alleged onset date.

3.  The claimant has the following severe impairments:  rheumatoid
arthritis; spinal fusion in 1992 with residual pain; dysfunction of major
joint (status post foot surgery) (Exhibit 7F/13 and 7F/8); mild obesity;
an affective disorder; an anxiety disorder; a personality disorder with a
history of drug and alcohol abuse in current remission (Exhibit 4F/2;
7F/6; and 5F/9).

4.  The claimant does not have an impairment or combination of
impairments that meets or medically equals the severity of one of the
listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, I find the claimant
has the residual functional capacity to perform sedentary work as
defined in 20 CFR 404.1567(a) and 416.967(a).  Specifically the
claimant can occasionally and frequently lift and or carry no more than
10 pounds; pushing and pulling within these weight limited to
occasional for the upper and lower extremities; the claimant can stand
or walk two hours out of an eight-hour work day <u>with no prolonged
walking greater than 15 minutes at a time</u> and sitting is limited to six
hours out of an eight-hour workday with the ability to stand and
stretch one minute at the end of each hour for up to one minute not to
exceed 10 percent of the day; the claimant cannot climb ladders, ropes
or scaffolds; postural positions are limited to occasional; the claimant
should not work in a hazardous work environment such as at
unprotected heights, operating dangerous or fast moving machinery or
driving commercial vehicles; reaching is limited to occasional;
fingering and handling is limited to frequent; the claimant is limited to
non-public, simple repetitive tasks, with SVP of one to two in a static
work environment with only occasional superficial contact with co-
workers and supervisors.

6.  The claimant is unable to perform any past relevant work.

7.  The claimant was born on June 26, 1970, and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the claimant can perform.

11.  The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2010, through the date of this decision.

(Doc. 10, tr., at 21-22, 24, 30-32.)

The ALJ found that Boyer's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, she found that Boyer's statements of record, testimony, and statements in the function report and pain questionnaire concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible, but were credible to the extent that she can do the sedentary jobs described in the decision.  (Tr., at 27.)

The ALJ found Boyer's allegations to be inconsistent with the objective medical findings in the record.  (Tr., at 27-28.)  The evidence of record revealed that Boyer had normal range of motion involving the joints of her arms and legs. Although she had tenderness in her right shoulder, she had normal range of motion

12

there.  Again, she had tenderness over the midline of the lumbar spines, but normal range of motion involving the back.  The ALJ noted that Boyer claimed that she did not eat on her "bad days," which she said were four to five days a week, but her weight remained stable at 180-189 pounds on a five foot five inch frame.  The ALJ also pointed out that Boyer reported spending most of her day lying down, and very little time sitting.  The ALJ found there was no evidence that mentioned a need to lie down during the day.  (Tr., at 28.)

The ALJ pointed out that Boyer received unemployment benefits, and that, generally, in order to received unemployment benefits, the individual must be able to work.  While the ALJ recognized this fact is not determinative on the issue of "disability," she stated it bears negatively as to Boyer's credibility.  (Tr., at 28.)

The ALJ gave "greatest weight" to Dr. Oyekanmi's medical opinion regarding Boyer's physical limitations.  (Tr., at 28.)  The ALJ stated that "Dr. Oyekanmi's sedentary limits are essentially the same as those" in the ALJ's decision.  (Tr., at 28-29.)  The ALJ reported that she "added further restrictions about reaching, handling, and fingering based on [Boyer's] symptoms of pain related to rheumatoid arthritis."  The ALJ gave "less weight" to the agency review physician who found Boyer could perform work at the "light" level.  (Tr., at 29.)

The ALJ found that Boyer has not been under a disability from December 1, 2010, through the date of the decision.  (Tr., at 32.)

13

## VI.  DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when he establishes disability within the meaning of the Social Security Act.  See 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  See 20 C.F.R. §§ 404.1505, 416.905.

## VII.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence.  Blakley v. Comm'r of Social Security, 581 F.3d 399, 405 (6th Cir. 2009); Richardson v. Perales, 402 U.S. 389, 401 (1971).  "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  See Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, that determination must be affirmed.  Id.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute

14

differently, or substantial evidence also supports the opposite conclusion.  See

Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986); Kinsella v. Schweiker, 708 F.2d

1058, 1059 (6th Cir. 1983).  This court may not try the case de novo, resolve

conflicts in the evidence, or decide questions of credibility.  See Garner v. Heckler,

745 F.2d 383, 387 (6th Cir. 1984).  However, the court may examine all the evidence

in the record in making its decision, regardless of whether such evidence was cited

in the Commissioner's final decision.  See Walker v. Sec'y of Health & Human

Servs., 884 F.2d 241, 245 (6th Cir. 1989).


## VIII.  ANALYSIS

Boyer challenges the ALJ's decision on two grounds:

> 1.  Whether the ALJ's assessment of Ms. Boyer's Residual Functional
> Capacity ["RFC"], which excludes the full extent of plaintiff's upper
> extremity limitations, is supported by substantial evidence.
>
> 2.  Whether substantial evidence proves Ms. Boyer's disability once her
> upper extremity limitations are properly accounted for.

(Doc. 14, at 1.)  The two issues are inter-related, because the second ground rests on

the correctness of the first ground.  (Doc. 14, at 12.)

Boyer argues that the ALJ erroneously determined that Boyer "has the

capacity to occasionally and frequently lift and carry up to 10 pounds and can

frequently finger and handle."  (Doc. 14, at 9, citing tr., at 24.)  This allegedly faulty

finding caused the ALJ to reach the incorrect conclusion that Boyer has the capacity

to engage in jobs requiring fingering and handling, and thus could engage in substantial gainful activity.  (Doc. 14, at 9.)

Boyer contends that the ALJ's RFC determination does not accurately reflect Dr. Oyekanmi's restrictions.  Boyer points out that the ALJ gave the consulting examiner Dr. Oyekanmi's opinion the "greatest weight."  (Doc. 14, at 9.)  Boyer asserts that Dr. Oyekanmi diagnosed rheumatoid arthritis, and restricted Boyer to "no more than 10 pounds of lifting, pushing, pulling, and carrying, all on an occasional basis (up to one-third of an eight-hour period)."  (Doc. 14, at 10, citing tr., at 323.)  Thus, Boyer argues that the ALJ erred in finding Boyer can frequently lift and carry up to 10 pounds.

Boyer concedes that Dr. Oyekanmi did not place any limitations on her capacity to handle and finger.  Nevertheless, she agues that the clinical findings of her treating physicians demonstrate these restrictions.  (Doc. 14, at 10.)  Boyer asserts that the evidence, her own testimony, and the ALJ's observations prove that Boyer has a more significant degree of restriction in handling and fingering than that identified by the ALJ.  (Doc. 14, at 11.)

With respect to Boyer's ability to finger and handle, the Commissioner points out that the medical evidence Boyer cites in support pre-dates the date on which she alleges she became disabled, December 1, 2010.  (Doc. 15, at 8.)  The Commissioner contends that the evidence dated after December 1, 2010, demonstrates that her rheumatoid arthritis is controlled with medication.  (Doc. 15, at 9, citing tr., at 295-304, 394, 401-402, 410, 414.)  The Commissioner points out

16

that Boyer had no range of motion limitations in her hands (or elsewhere). (Doc. 15, at 9, citing tr., at 317-320.)

Most importantly, the Commissioner argues that there "simply is no evidence to support [Boyer's] contention that she cannot frequently finger and handle." (Doc. 15, at 9.) As the Commissioner points out, "Dr Oyekanmi identified no limitations restricting [Boyer's] ability to finger and handle." (Doc. 15, at 9, citing tr., at 317-320.) Nor did any other medical provider place any such limitations on Boyer's ability to work. Specifically, Boyer does not identify any medical opinion which would support a finding that Boyer could not perform any substantial gainful employment by reason of a medically determined limitation on fingering or handling. See generally 20 C.F.R. §§ 404.1512(a), (c); 416.912(a), (c) (claimant's burden to furnish medical and other evidence).

Returning to the issue of Boyer's capacity to lift and carry, the Commissioner states that it is the ALJ's responsibility to review the evidence and formulate a residual functional capacity. (Doc. 15, at 7-8, citing 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c), 416.945(a)(3), 416.946(c).) The Commissioner contends that the ALJ carefully and fairly reviewed all the relevant medical evidence of record, and properly assessed Boyer's physical RFC. (Doc. 15, at 8.)

The Commissioner notes that Dr. Oyekanmi is not a treating physician, whose opinion would be given "controlling" weight. (Doc. 15, at 8, citing 20 C.F.R. §§ 404.1527, 416.927.) Although the ALJ gave Dr. Oyekanmi's opinion the "greatest weight," the ALJ is not bound by every detail of the opinion. While the

17

ALJ recognized that Dr. Oyekanmi would limit Boyer to occasional lifting, carrying, pushing and pulling up to ten pounds, the Commissioner contends the ALJ properly determined that Boyer could frequently lift and carry up to ten pounds, based on evidence of record.  (Doc. 15, at 8, citing tr., at 24.)

As mentioned earlier, the ALJ found that Boyer's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; but she found that Boyer's statements, testimony, and statements in the function report and pain questionnaire concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible.  (Tr., at 27.)

The ALJ found Boyer's allegations to be inconsistent with the objective medical findings in the record.  (Tr., at 27-28.)  The evidence revealed that Boyer had normal range of motion involving the joints of her arms and legs.  Although she had tenderness in her right shoulder, she had normal range of motion there.  She had tenderness over the midline of the lumbar spines, but normal range of motion involving the back.  The ALJ noted that Boyer claimed that she did not eat on her frequent "bad days," but her weight remained stable at 180-189 pounds.  The ALJ also pointed out that Boyer reported spending most of her day lying down, and very little time sitting, although there was no evidence that mentioned a need to lie down during the day.  (Tr., at 28.)

The ALJ stated that "Dr. Oyekanmi's sedentary limits are essentially the same as those" in the ALJ decision.  (Tr., at 28-29.)  Dr. Oyekanmi had stated that "some physical activity limitations would be beneficial," including being limited to

light tasks, including occasional lifting and carrying of no more than ten pounds.
Dr. Oyekanmi's recommendation that such a limitation would be "beneficial"
(rather than strictly necessary) was given in the context of allowing "light tasks."
(Tr., at 323.)

Discussing other opinion evidence, the ALJ found an opinion that Boyer could
perform work at the "light exertional level" not to be reasonable considering the
totality of the evidence.  (Tr., at 29.)  The ALJ determined that Boyer was only
capable of performing sedentary, rather than light, work.  (Tr., at 30, 31-32.)  While
the ALJ determined that Boyer could lift and carry up to ten pounds frequently,
rather than occasionally, the ALJ adopted the ten pound limit.  Thus, the ALJ
adopted some aspects of Dr. Oyekanmi's conclusions, while modifying others in light
of the overall evidence in the record, in her role of determining an appropriate RFC.

To the extent that the ALJ's findings based on the credibility of the claimant,
those findings are accorded great weight and deference.  Walters v. Commissioner,
127 F.3d 525, 531 (6th Cir. 1997); Gonzalez v. Commissioner, No. 1:06CV687, 2008
WL 584927, at *5  (W.D. Mich. Jan. 17, 2008).  The ALJ's credibility determinations
must be "based on a consideration of the entire case record," and "must find support
in the record."  Rogers v. Commissioner, 486 F.3d 234, 247-248 (6th Cir. 2007).  The
court finds that the ALJ's credibility determinations are reasonable, specific, and
supported by substantial evidence.

The ALJ identified specific facts supported by the record which cast doubt on
the severity of the disabilities as described by Boyer.  (Tr., at 27-28.)  Because "a

reasonable mind might accept [the evidence] as adequate to support" his credibility determination, the court concludes that substantial evidence supports the ALJ's finding.  Norris v. Commissioner, No. 11-5424, 2012 WL 372986, at *5 (6th Cir. Feb. 7, 2012) (citing Rogers, 486 F.3d at 241).

The ALJ has the responsibility for reviewing all the evidence in making her determinations.  20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2).  The ALJ evaluates every medical opinion received in evidence.  20 C.F.R. §§ 404.1527(c); 416.927(c). The ALJ will consider any statements that have been provided by medical sources, whether or not based on formal medical examinations.  20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3).  Although the ALJ reviews and considers all the evidence before her, the responsibility for assessing the claimant's residual functional capacity rests with the ALJ.  20 C.F.R. §§ 404.1546(c); 416.946(c).  Here, the ALJ's findings were supported by relevant evidence and consistent with  the record as a whole.  The court finds that the ALJ's RFC is based on substantial evidence in the record, as outlined in her findings and supported by medical evidence.


IX.  SUMMARY

For the foregoing reasons, the court finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, that decision should be affirmed.

20

## X.  RECOMMENDATION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the undersigned recommends that the decision of the Commissioner be **AFFIRMED**.


s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge


Date:  June 18, 2015

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).